

#5350

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, ex rel. :

SUSAN JOHNTZ, M.D. :
    60 West Lodges Lane :
    Bala Cynwyd, PA  19004, and :
      :

GLENDA HEADLEY, R.N., Relators :
    3221 Philmont Ave. :
    Huntingdon Valley, PA 19006, :
      Plaintiffs :

    v. :

FRIENDS HOSPITAL; :
    4641 Roosevelt Boulevard :
    Philadelphia, PA 19124-2399, :

FRIENDS BEHAVIORAL HEALTH :
SYSTEM, LP :
    1500 Waters Ridge Drive :
    Lewisville, TX 75057, :

FRIENDS GP, LLC; :
    1500 Waters Ridge Drive :
    Lewisville, TX 75057, and :

PSYCHIATRIC SOLUTIONS, INC. :
    6640 Carothers Parkway, Suite 500 :
    Franklin, TN 37067 :
      Defendants :

CIVIL ACTION
NO. **10 7 281**

**FILED**

JURY TRIAL DEMANDED JAN 21 2010

MICHAEL E. KUNZ, Clerk.
By_____Dep. Clerk

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §3730(b)(2)
DO NOT PLACE IN PRESS BOX
DO NOT ENTER ON PACER**

**FALSE CLAIMS ACT COMPLAINT – Page 1 of 28**
*FILED UNDER SEAL*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| ex rel. | : | |
| SUSAN JOHNTZ, M.D., and | : | NO. _____ |
| GLENDA HEADLEY, R.N., Relators | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| | : | |
| v. | : | |
| | : | |
| FRIENDS HOSPITAL; | : | |
| FRIENDS BEHAVIORAL HEALTH | : | **FILED UNDER SEAL** |
| SYSTEM, LP; | : | **PURSUANT TO** |
| FRIENDS GP, LLC;  and | : | **31 U.S.C. §3730(b)(2)** |
| PSYCHIATRIC SOLUTIONS, INC. | : | **DO NOT PLACE IN PRESS BOX** |
| Defendants | : | **DO NOT ENTER ON PACER** |

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs-Relators, Susan Johntz, M.D., and Glenda Headley, R.N., through their attorneys, Bagby & Associates LLC, on behalf of the United States of America, bring this Complaint against defendants, Friends Hospital, Friends Behavioral Health System, LP, Friends GP, LLC, and Psychiatric Solutions, Inc. (collectively "defendants"), for money damages and all appropriate relief under the False Claims Act, 31 U.S.C. §3729 *et seq.*, and in support thereof, aver the following:

### INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent billing claims, statements, records, and claims made in support thereof and caused to be made by defendants and/or their agents, employees and independent contractors in violation of the Civil False Claims Act, 31 U.S.C. §3729 *et seq.*, as amended.

2.      Defendants are providers of behavioral health services to the public including, psychiatric and mental health crisis response and admission evaluation services, individualized inpatient services and programs for adolescents, adults, and older adults, including specialized programs for eating disorders and dual diagnoses (mental health/substance abuse) and other psychological and psychiatric services, and as such are participants in Medicare, Medicaid, and/or other federally and state funded health care programs, as well as participants in commercial third party health care insurance programs.

3.      Defendants have made false claims for reimbursement from the United States government and the Commonwealth of Pennsylvania under Medicare, Medicaid, and/or other federally funded health care programs, for medical and other treatment to patients under their care and supervision.  Defendants have made false claims to the United States government and Commonwealth of Pennsylvania through defendants' duly appointed agents for services purportedly rendered to individuals eligible for federally funded health care program benefits, and have been reimbursed for those claims when, in fact, such services were either not provided at all, were not medically necessary, or were so grossly substandard and inadequate as to constitute no care at all, as more fully alleged below.

4.      In some instances, pursuant to defendants' policy, instead of rendering psychiatric care and treatment based on medical necessity, patient care was governed by whether or not there were "days on the table" covered by Medicare, Medicaid and/or other health care insurance.  Rather than to provide appropriate and medically necessary psychiatric care and treatment to their patients, defendants unnecessarily retained as

inpatients individuals who were in fact medically appropriate for discharge, but who were retained as inpatients simply to maximize the reimbursement defendants received from state and federal agencies, as well as third party commercial payors.

5.      In other instances, defendants billed for services which should have been provided but which were not provided at all.

6.      In still other instances, the services which were provided and for which defendants were reimbursed with federal and state funds were so grossly inadequate and below the minimum clinical standards as to have effectively constituted no treatment at all.

7.      Defendants falsely certified to the United States government, both expressly and impliedly, that the care provided was in compliance with applicable standards as required by federal and state healthcare programs, when, in fact, defendants' care was grossly and intentionally substandard.

8.      In short, defendants' chronic and intentional violations of a myriad of federal and state laws and regulations including, but not limited to, the False Claims Act, were designed to falsely and illegally inflate the Medicare, Medicaid, and other insurance reimbursement funds defendants' were receiving from state and federal agencies, as well as third party commercial payors.

9.      As a result, the defendants caused the submission of and were reimbursed by federally funded health care programs for multiple false claims for the care and treatment provided to mental health patients entrusted to their care based on defendants' express and implied misrepresentations.

**FALSE CLAIMS ACT COMPLAINT – Page 4 of 28**
*FILED UNDER SEAL*

10.     Relators will provide to the Attorney General and the United States Attorney a full disclosure of substantially all material facts, as required by the False Claims Act, 31 U.S.C. §3730(b)(2).

## I.    JURISDICTION AND VENUE

11.    This action arises under the False Claims Act 31 U.S.C. §3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§3732(a) and 3730(b) and pursuant to 28 U.S.C. §1345 and 28 U.S.C. §1331, inasmuch as this action seeks remedies on behalf of the United States for violations of the False Claims Act by defendants.  The Court has supplemental jurisdiction over the plaintiffs' state claims pursuant to 28 U.S.C. §1367(c), as such claims form part of the case or controversy as the federal claims.

12.    Venue is proper in this District under 31 U.S.C. §3732(a) because Friends Hospital resides and transacts business in the Eastern District of Pennsylvania and because the conduct proscribed by 31 U.S.C. §3729 *et seq.*, and complained of herein took place in this district.  Venue is also proper pursuant to 28 U.S.C. §1391 (b) and (c) because at all times material and relevant hereto, all defendants transacted business in this District.

## II.    PARTIES

13.    Relator Susan Johntz, M.D., is a citizen of the United States and a resident of the State of Pennsylvania.  From February of 2009 to November 10, 2009, Relator Johntz served as a staff psychiatrist for Friends Hospital in the Crisis Response Center ("CRC") and/or the Admissions and Evaluation Center ("AEC") and, at certain times relating hereto, was the Interim Medical Director of the AEC at Friends Hospital.  In this

capacity, she served as a psychiatrist both delivering direct care and supervising the provision of care and the quality of care for patients in the CRC and AEC at Friends Hospital. Relator Johntz brings this action based on her direct, independent, and personal knowledge and also on information and belief.

14. Relator Glenda Headley, R.N., is a citizen of the United States and a resident of the State of Pennsylvania. From approximately 2000 to December 16, 2009, Relator Headley was employed as a nurse at Friends Hospital in the Crisis Response Center ("CRC") and/or the Admissions and Evaluation Center ("AEC"), and, at certain times relating hereto, was the Nurse Manager of the CRC and AEC at defendant Friends Hospital. In this capacity, she served as a nurse both delivering direct care and supervising the provision of care and the quality of care for patients in the CRC and/or AEC at Friends Hospital. Relator Headley brings this action based on her direct, independent, and personal knowledge and also on information and belief.

15. The Relators are an original source of information underlying this Complaint and provided to the United States. They have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States Government under the False Claims Act.

16. Defendant, Friends Hospital ("Friends") is a Pennsylvania business entity and/or fictitious name under which the other defendants do business, organized under the laws of Pennsylvania and having its principal place of business in Pennsylvania at 4641 Roosevelt Boulevard, Philadelphia, PA 19124-2399. Friends Hospital is a private psychiatric hospital and has been one of the Delaware Valley's largest providers of inpatient behavioral health services, having provided crisis response and emergency

psychiatric evaluations and admissions, and individualized inpatient programs for adolescents, adults, and older adults.

17.    Upon information and belief, defendant Friends contracted with the United States government and the Pennsylvania Department of Public Welfare to provide crisis response evaluation and care as well as inpatient psychiatric, psychological, and medical care to adolescent and adult Medicare and Medicaid patients, as well as patients covered by other federally funded health care programs, such as military benefits through TRICARE, the Federal Employees Health Benefits Program, and other federally funded insurance.

18.    Defendant, Friends Behavioral Health System, LP ("FBHS"), is a limited partnership, organized and doing business under the laws of Pennsylvania, with a principle place of business located at 1500 Waters Ridge Drive, Lewisville, TX 75057, with CT Corporation System as its local registered agent for service, at 116 Pine Street, Suite 320, Harrisburg, PA 17101. FBHS does business as Friends Hospital or, in the alternative, defendant Friends Hospital is subsidiary of and is owned and controlled by FBHS. Upon information and belief, defendant FBHS owns, operates and controls or does business as defendant Friends Hospital.

19.    Defendant, Friends GP, LLC ("Friends GP"), is a limited liability company, organized and doing business under the laws of Pennsylvania, with a principle place of business located at 1500 Waters Ridge Drive, Lewisville, TX 75057, with CT Corporation System as its local registered agent for service, at 116 Pine Street, Suite 320, Harrisburg, PA 17101. Defendant Friends GP is the general partner of defendant FBHS. Upon information and belief, defendant Friends GP owns, operates and controls

defendants, FBHS and Friends Hospital, and does business as defendant Friends
Hospital.

20.     Defendants Friends Hospital, Friends Behavioral Health System, LP, and
Friends GP, LLC are collectively referred to in this complaint as "Defendant Friends."

21.     Defendant, Psychiatric Solutions, Inc. ("PSI") is organized under the laws
of the State of Delaware and has its principal place of business in Tennessee at 6640
Carothers Parkway, Suite 500, Franklin, TN 37067. Defendants, FBHS and Friends GP,
are corporate subsidiaries of defendant, PSI. Upon information and belief, as of May
2007 to the present, PSI owned, operated, managed and controlled defendants, Friends
GP, FBHS, and Friends Hospital.

22.     Upon information and belief, at all times material to plaintiffs' complaint,
PSI disregarded the corporate boundaries between defendant PSI and Defendant Friends
and actively and directly managed, supervised, controlled and directed the operations,
policies and procedures directly impacting patient care, treatment, and billing practices
for services at Defendant Friends, including but not limited to the on-site management
and direction of staffing, clinical issues, and patient treatment, quality of care and billing
issues at Friends.

## III.    THE FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

### A.    *Medicare Background*

23.     In 1965, when Title XVIII of the Social Security Act was adopted,
Congress established the Medicare program to provide health insurance for the elderly
and disabled. Individuals and patients who receive benefits under Medicare are
commonly referred to as "beneficiaries." Medicare is financed by federal funds (the

"Medicare Trust Fund"), including funds from payroll tax deductions from the work force and premiums paid by beneficiaries.

24.     Benefits available under Medicare are prescribed by statute and by federal regulations administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare and Medicaid Services ("CMS").

25.     Administration of claims is effectuated through local Medicare carriers, who are responsible for processing Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

26.     Hospitals that wish to participate in the Medicare program must execute a contract known as a provider agreement with CMS.  Upon information and belief, defendant Friends has executed a provider agreement with CMS.  Provider agreements are executed upon a providers' initial enrollment into the Medicare program, upon renewal and upon any change in a provider's business structure.

27.     In the provider agreement, each hospital certifies that it will adhere to the Medicare laws, regulations, and program instructions.  The provider agreement also requires hospitals to acknowledge that any deliberate omission, misrepresentation or falsification of any communication supplying information to CMS may be punished by criminal, civil, or administrative penalties, including fines, civil damages and/or imprisonment.

28.     Upon information and belief, Defendant Friends and/or PSI signed such provider agreements with Medicare, as well as other federally funded health insurance programs, including but not limited to Medicaid, and other private commercial health care providers.

**B.**     *Other Federally Funded Health Insurance Programs, including Medicaid*

29.     Federal health care programs also include any plan or program that provides health benefits directly or indirectly through insurance or otherwise funded directly in whole or in part by the United States government. 42 U.S.C. §1330a-7b(f)(1). These include military benefits through the TRICARE program, the Federal Employees Health Benefits Program, and other federally funded insurance.

30.     State Medical Assistance (or "Medicaid") programs are also federal health care programs. 42 U.S.C. §1320a-7b(f)(2).

31.     Specifically, the United States of America and the several states fund health care treatment for the mentally ill through Medicare and Medicaid. The United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services, administers the Medicare and Medicaid program. In order to receive reimbursement, health care providers who provide care to Medicare and Medicaid recipients must comply with and certify compliance with all applicable quality of care standards.

32.     Those quality of care standards are set forth in federal and state laws and regulations, which require health care facilities to provide their patients with medically necessary care and services to attain or maintain the highest practicable physical, mental and psychological well-being, in accordance with a comprehensive assessment and plan of care, and assure that patient services will be of a quality that meet professionally recognized standards of health care, as well as the standards set by state and federal governments. See 42 U.S.C. §1396 *et seq*. The Secretary of Health and Human Services, who oversees the Medicaid program, is entitled to exclude any health care

provider who furnishes patient services of a quality that fails to meet professionally recognized standards of health care. Regulations define abuse by Medicaid providers as provider practices that are inconsistent with sound medical practices, result in an unnecessary cost to the Medicaid program, or fail to meet professionally recognized standards of care. See 42 C.F.R. §455.2.

33.    In addition to federal laws and regulations that define quality of care, each state's Medicaid program must contain procedures relating to the payment for health care services sufficient to assure that they are consistent with quality of care. The Commonwealth of Pennsylvania has promulgated detailed regulations enumerating proper standards of care for all Medicaid health care providers.

34.    Specifically, pursuant to 42 U.S.C. §1396, which provides that federal Medicaid funds will be disbursed through state Medicaid programs, the Commonwealth of Pennsylvania has promulgated regulations to further impose certain standards upon Medicaid providers. Pennsylvania Code §1151.48(15) provides, that "days of inpatient care provided to a recipient who is suitable for an alternate type or level of care, regardless of whether the recipient is under voluntary or involuntary commitment" cannot be reimbursed and are "noncompensable" under Pennsylvania Code governing inpatient psychiatric admissions.

35.    The Commonwealth of Pennsylvania administers the Medicaid programs, regulates the disbursement of Medicaid funds to health care providers in the state and ensures statutory and regulatory compliance through its Department of Public Welfare.

36.     As part of its Medicaid program, the Commonwealth of Pennsylvania

contracts with private inpatient treatment facilities to provide inpatient services to

adolescent and adult Medicaid recipients in need of psychiatric care. Defendant Friends

Hospital is a psychiatric inpatient facility that provided inpatient psychiatric care and

treatment to Pennsylvania Medicaid recipients.

37.     Upon information and belief, in order for a provider to provide services

for Medicaid recipients in Pennsylvania, the provider must enter into a provider

agreement. By the terms of that agreement, the provider agrees that its submission of

claims is a certification that that services contracted for were provided, that it is subject

to all relevant laws and regulations, and that it has a responsibility to know the law.

Upon information and belief, Defendant Friends and/or PSI signed such provider

agreements with the Commonwealth of Pennsylvania.

## IV.     DEFENDANTS' FAILURE TO PROPERLY CARE FOR VULNERABLE, MEDICALLY FRAGILE MENTAL HEALTH PATIENTS

38.     The Commonwealth of Pennsylvania contracts with psychiatric inpatient

facilities to provide mental health treatment to residents of the Commonwealth in need

of psychiatric services. Defendant Friends, which is owed, operated and controlled by

defendant PSI, is a psychiatric inpatient facility where Pennsylvania adolescents and

adults deemed in need of psychiatric care and treatment are evaluated and treated.

39.     During the course of their employment, Relators discovered defendants'

Medicare, Medicaid, and/or other federally funded health care program fraud and abuse,

as well as fraud and abuse in claims submitted to commercial third party payors which is

believed to cover the time period of May 2007 to present and which includes, but is not

limited to, claims for psychiatric care and treatment that either was not medically necessary, was not rendered at all or was so grossly substandard as to constitute no treatment at all.

40.     Upon information and belief, defendants were operating Friends Hospital on a provisional license following a long-standing pattern of violations of the regulations applicable to an inpatient psychiatric hospital.

41.     As set forth in more detail below, defendants failed, in whole or in part, to formulate, adopt, and enforce adequate rules and policies to ensure the delivery of timely and appropriate care and treatment, to ensure the completeness, accuracy and adequateness of patients' hospital records, to select, train and retain only competent physicians and other staff to oversee all persons who practice medicine at defendant Friends Hospital to ensure the delivery of timely, quality care for all patients, and to ensure that a competent member of the medical staff was at all times supervising all aspects of patient care.

**A.     Defendants' Failure to Render Appropriate Treatment Based on Medical Necessity in Accordance with the Applicable Standards of Care.**

42.     Defendants' services substantially departed from generally accepted standards of professional care, thereby exposing patients who presented and/or were admitted to defendant Friends Hospital to significant risk and, in some cases, to actual harm and death.

43.     In June of 2009, defendants replaced defendant Friends Hospital's Chief Executive Officer, Arris Veronie, with Fran Sauvagueau, a PSI employee, who acted as Interim Chief Executive Officer.

44.     At the direction of defendant PSI and defendant Friends' Interim Chief Executive Officer, Mr. Sauvagueau, patients no longer medically in need of inpatient psychiatric treatment were nevertheless ordered to be retained as inpatients for the purpose of inflating and maximizing Friend's reimbursement from the government and other insurers.

45.     Specifically, Fran Sauvagueau, defendant PSI's Division President and Interim Chief Executive Officer of Friends Hospital, directed psychiatrists to keep patients in the hospital even though treatment was no longer medically necessary. Sauvagueau stated during meetings, "PSI does not leave days on the table" in reference to days for which the patient was eligible or had been pre-approved for Medicare, Medicaid, or other insurance coverage but which days had not yet been used during the patient's stay.

46.     Pursuant to Sauvagueau's direction, other administrators also ordered and directed physicians and staff members to "use all covered days" and "leave no days on the table" with regard to patient care regardless of whether further inpatient treatment was in fact medically necessary.

47.     In August of 2009, defendants announced that a new CEO would be assuming leadership of Friends Hospital.

48.     In September of 2009, Kenneth Glass, Ph.D. was formally named as the Chief Executive Officer of Friends Hospital. Dr. Glass continued the practice implemented and directed by PSI of not leaving "days on the table" and repeatedly stated to physicians and staff, "We will not leave days on the table."

49.    Dr. Glass directed and pressured psychiatrists not to discharge patients with "days on the table," and stated that any psychiatrists not willing to retain as inpatients those patients with days on the table would be fired.  Psychiatrists unwilling to comply with the directives of defendants were pressured to resign or were fired by Dr. Glass.

50.    During daily meetings, Dr. Glass would review which patients were scheduled for discharge to determine whether the patient has "days on the table."  Dr. Glass would direct and pressure the psychiatrists, administrative personnel and all clinical staff to keep such patients as inpatients in the hospital regardless of medical necessity.

51.    Conversely, if patients had no federal or state funds or medical insurance to cover their stay at the hospital, such patients were directed to be "streeted," that is refused admission or discharged regardless of the medical necessity for inpatient treatment.

52.    Patients in need of evaluation and inpatient psychiatric treatment were routinely denied inpatient admission if they did not have eligibility for Medicare, Medicaid, or adequate insurance and, in other instances, were "23ed," that is provided a chair or bed for observation for 23 hours only and frequently provided inadequate psychiatric treatment and evaluation.

53.    Defendants also directed psychiatrists and nurses to "show the patients the door," if the patients presenting were not approved for Medicare, Medicaid or insurance coverage, even though the patient presenting had acute psychiatric symptoms, including suicidality and homicidality.

**B.      Defendants' Failure to Render Appropriate Inpatient Treatment**
**in Accordance with the Applicable Standards of Care.**

54.     Defendants' inpatient services grossly and substantially departed from

generally accepted professional standards of care, thereby exposing individuals

presenting to and admitted to Friends Hospital to significant risk and, in some cases, to

actual harm and death, because of Friends' failure to render appropriate care.

55.     Defendants failed to provide adequate inpatient psychiatric and/or medical

care and treatment and, instead, provided care that was so substandard as to be

tantamount to no services at all, which failures included, but were not limited to:

> (a)     failure to timely perform and document the initial physical
> examinations of patients and the failure to obtain and record the
> patients relevant medical and psychiatric history;

> (b)     the failure to create adequate and sufficient individualized
> treatment plans for patients;

> (c)     the failure to give therapy and/or treatment as indicated in patient's
> treatment plans, or the rendering of such therapy on an untimely
> basis;

> (d)     the failure to perform timely evaluations including initial
> evaluations and progress notes by physicians, which evaluations
> were not timely provided, not provided at all or were not
> adequately documented as SOAP or DAP evaluations;

> (e)     the failure to provide adequate suicide and safety precautions,
> timely patient observations and patient risk reduction practices;

> (f)     inadequate observation of patients while admitted to the inpatient
> units;

> (g)     inadequate staff to patient ratio;

> (h)     overreliance on untrained or inadequately trained temporary staff
> in critical high risk clinical situations;

(i)     inadequate supervision and leadership resulting in a failure to adopt and enforce adequate policies and procedures;

(j)     failure to adopt and enforce adequate elopement precautions and/or procedures;

(k)     failure to adequately document patient charts;

(l)     lack of coordination of patient care;

(m)    provision of inappropriate and/or expired medication;

(n)     failure of to have adequate and functioning monitoring and/or recording equipment for patient safety and observation;

(o)     repeated instances where actual recordings from monitoring equipment were erased or lost;

(p)     intentional alteration of medical and other records, and untimely recreation of entries on medical charts to pass state and other inspections and/or audits.

**C.      *Defendants' Failure to Render Appropriate Treatment in the CRC and the AEC in Accordance with the Applicable Standards of Care.***

56.     Further, defendants' services provided in the Crisis Response Center (hereinafter the "CRC") and/or the Assessment and Evaluation Center (hereinafter the "AEC) grossly and substantially departed from generally accepted professional standards of care, thereby exposing individuals receiving treatment at Friends Hospital to significant risk and, in some cases, to actual harm or death.

57.     With regard to care rendered in the CRC and/or the AEC, defendants failed to provide adequate medical and psychiatric care and treatment and, instead, provided care that was so substandard as to be tantamount to no services at all including, but not limited to:

(a)     inadequate policies and procedures for safety and risk reduction;

(b)     inadequate policies and procedures for quality of care;

(c)     lack of timely evaluation, assessment, care and treatment;

(d)     failure to adequately observe and monitor patients, including the failure to observe high risk patients on a one-to-one, constant observation or fifteen minute check basis;

(e)     lack of adequate staff;

(f)     violations of The Emergency Medical treatment and Active Labor Act, "EMTALA," in certifying overall compliance when in fact defendants failed and refused to timely evaluate and treat presenting patients;

(g)     inadequate and/or lack of documentation resulting in substandard patient care and treatment and/or the alteration of such records to make it appear as if adequate care was rendered;

(h)     administration of medication that was expired;

(i)     back-dating Medicaid and insurance applications so that initial evaluations in the CRC and/or AEC could be billed or double billed for patients subsequently admitted as inpatients to defendant Friends;

(j)     billing for services rendered in the CRC and/or the AEC at the inpatient rate.

58.     The staffing at Friends has been so substantially reduced that quality care cannot be rendered. By way of example, in July and August or 2009 the defendants increased staffing in the AEC to 44 full time employees solely for the purpose of attempting to pass a Pennsylvania Department of Public Welfare survey in August 2009. Following the survey, however, defendants cut the staff from 44 to 33 employees in September and from 30 to 15 employees in December 2009, despite a continuing patient load which required increased staffing in order to deliver the required quality of care.

59.     Staff in the CRC and/or AEC were instructed by defendant that for certain patients, known as "frequent flyers," commonly suffering from chronic pain and dual diagnoses and who frequently sought mental health care, such patients were to be treated

as "do not admits." The patients were provided a "23 bed" so that they would not be admitted as inpatients regardless of medical necessity. Defendants maintained a list of such "do not admit" patients on a dry erase board in the CRC and AEC so staff would know who they were and would know not to admit them. The names were erased by and at the direction of defendants when inspectors and survey teams visited the facility so that the existence of such practices would be concealed.

60.     Staff in the CRC and/or AEC had such lack of coordination of care and communication that often when psychiatrists increased the level of observation of a patient, this was not communicated to the staff so the increased observation was never implemented.

61.     As such, the overall lack of quality compliance with the basic standard of care rendered the treatment at defendant Friends so substandard as to be tantamount to no treatment at all.

D.     *Falsification of Records*

62.     Upon information and belief, defendants have falsified both patient medical records and the records of billings and claims for reimbursement from governmental and other payors.

63.     By way of example, defendants were aware of the lack of compliance with adequate medical record keeping, documentation and quality of care during a survey conducted by the Department of Public Welfare from August 10 to 12, 2009, and attempted to conceal the substandard care, treatment, and documentation by falsifying and materially altering patient charts to reflect that services, treatments and care had been provided and timely documented when in fact they had not.

64.     During the survey, Relator Headley, as Nurse Manager of the AEC, was called to the Medical Records Department where she observed other individuals reviewing patient charts prior to their submission to DPW surveyors.

65.     Upon arrival, Ms. Denise Montgomery, defendants' Director of Nursing and Clinical Services, handed Relator Headley approximately thirty (30) patient charts and instructed her to find "good charts" which could be used during the survey.

66.     Relator Headley reviewed the charts and found no chart to be in compliance with appropriate clinical practices, and found all of the charts were deficient in some way.

67.     Ms. Montgomery then provided Relator Headley with five black pens of different types and inks and instructed Relator Headley to "make them good."

68.     Relator Headley stated that she needed to return to the AEC to check on patients, declining to alter patient charts, to which Francine Fagan, defendants' Assistant Director of Nursing, responded, "You don't like to play in any of our reindeer games."

69.     Prior to her departure from the Medical Records Department, Relator Headley observed Denise Montgomery and Francine Fagan writing on and, based on information and belief, materially altering the medical records in patients' charts in an effort to conceal the defendants' failure to render appropriate care and their lack of quality compliance with the basic standards of care.

70.     On information and belief, records in the CRC/AEC were also altered to appear as if ordered and medically required care and observational safety checks had been performed on patients when in fact they had not been performed.

71.     On information and belief, records of billings to governmental and other payors have also been falsified by the defendants.

72.     For instance, defendants have submitted forms for reimbursement even though physicians had not signed off on the treatment as required, such signatures being provided untimely or by individuals other than the signatories.

73.     On information and belief, defendants backdated applications for benefits from federally funded programs in order to obtain reimbursement for evaluations performed in the CRC and/or the AEC which would not otherwise be reimbursed.

74.     On information and belief, defendants also billed the government for services under certain CPT codes and, if the service was not approved for payment, resubmitted the bill under a different CPT code in order to collect reimbursement.

**E.     *Defendants' Response To Efforts By Relators To Address Issues Identified Above***

75.     Relator Johntz uncovered the facts underlying this complaint while working as a psychiatrist in the CRC and the AEC at defendant Friends Hospital and attempted to address these problems with superiors employed by defendants.  By way of example, Johntz made numerous requests to maintain staffing sufficient to perform necessary and appropriate safety precautions, including one to one observation, constant observation and 15 minute checks for high risk patients in the AEC.  As a result of her requests, on November 10, 2009, Relator Johntz was discharged in retaliation for Relator's actions.

76.     Relator Headley also uncovered the facts underlying this complaint while working as nurse manager in the CRC and the AEC at defendant Friends Hospital and attempted to address these problems with superiors employed by defendants.  As an

example, Relator Headley expressed concern about the lack of staffing, and the care and

safety being provided to patients and as a result on or about December 16, 2009, Relator

was discharged in retaliation for Relator's comments.

**F.    _The Defendants' Acts Causing The Submission Of False Claims_**

77.    Defendants submitted claims for services which were not provided at all,

and for services which though provided were medically unnecessary and/or provided in

such a substandard way as to constitute essentially worthless care to patients covered

through Medicare, Medicaid and/or other federally funded health care programs.

Defendants submitted thousands of such claims to Medicare, Medicaid, FEHBP,

TRICARE, and/or other federally funded health care programs and commercial third

party payors and received reimbursement therefore.

78.    Federal law provides: "It shall be the obligation of any health care

practitioner and any other person . . . who provides health care services for which

payment may be made . . . to assure . . . that services . . . (1) will be provided

economically and only when, and to the extent, medically necessary; (2) will be of a

quality which meets professionally recognized standards of health care; and (3) will be

supported by evidence of medical necessity . . . ." 42 U.S.C. §1320c-5(a).

79.    When patients were retained as inpatients when there was actually no

medical necessity for them to remain as inpatients, the federal government was

defrauded because the defendants submitted claims to Medicare, Medicaid, FEHBP,

TRICARE, and/or other federally funded health care programs for services that were

medically unnecessary and were not indicated for that patient. When patients were not

provided the services for which reimbursement was claimed or were provided grossly

substandard care or even abused, the federal government was defrauded because it paid for services that were not rendered or were so substandard as to be tantamount to no services at all. In other words, each and every instance in which a patient eligible for benefits under a federally funded health care program was provided unnecessary, worthless or detrimental care or provided no care at all as set forth above, and the defendants submitted a false claim for payment from the federal government and were reimbursed therefor.

80. The defendants also, upon information and belief, all signed provider agreements certifying that they would provide necessary and adequate medical care to Medicare, Medicaid, and other federally funded health program (as well as commercial third party programs) recipients and would comply with all relevant laws and regulations. When the defendants did not provide such care and failed to comply with all relevant laws and regulations set forth above, and nevertheless submitted claims for payments, they made false claims, but were reimbursed therefor. These acts, along with others, caused the federal government to be defrauded and pay out moneys that should not have been paid.

81. On information and belief, defendants and/or persons employed by or affiliated with defendants continue to fraudulently bill the federal government for services either not indicated, not rendered, or essentially worthless or detrimental.

## COUNT ONE

## FEDERAL FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. §3729)

82.     Relators reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

83.     Defendants each knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be made or used, for the purpose of obtaining or aiding in obtaining the payment or approval of false claims by the United States government and the Commonwealth of Pennsylvania.

84.     Defendants submitted or caused to be submitted false or fraudulent claims to the federally funded health care programs that were fraudulent because they were made for the reimbursement for services which were in fact either not provided or were medically unnecessary.   Further, defendants submitted or caused to be submitted false or fraudulent claims to federally funded health care programs that were fraudulent because they were made for reimbursement of care that purportedly met professionally recognized standards of care when, in fact, the care provided was so substandard as to constitute worthless care, no care at all, or even detrimental care.

85.     Further, defendants certified to the government that they provided services in compliance with all applicable statutes and regulations when in fact such certification was false.

86.     This course of conduct violated the False Claims Act, 31 U.S.C. §§3729 *et seq.*

87.     The United States government, unaware of the falsity of the claims, and in reliance on the accuracy of the claims for reimbursement made payment upon false or fraudulent claims and was therefore damaged.

## COUNT TWO

### CONSPIRACY TO SUBMIT FALSE CLAIMS, 31 U.S.C. §3729(A)(3)

88.     Relators reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

89.     Defendants combined, conspired, and agreed together to defraud the United States government by knowingly causing false claims to be submitted to the United States government for the purpose of having those claims paid and ultimately profiting from those false claims.  Defendants committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. §3729(a)(3), causing damage to the United States government.

## COUNT THREE

### COMMON LAW FRAUD

90.     Relators reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

91.     Defendants have engaged in a pattern and practice whereby they caused claims to be submitted when they knew or should have known that these claims were false, and intended to induce federally funded health care programs to rely on them to pay for unnecessary or worthless medical services provided to federally funded health care program recipients.

92.     The United States government paid these false or fraudulent claims because of the acts Defendants.

93.     By reason of these payments, the United States government has been damaged in an amount to be determined at trial exclusive of interest and costs.

## COUNT FOUR

### UNJUST ENRICHMENT

94.     Relators reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

95.     Defendants conduct has unjustly enriched them with monies which in good conscience they should not be allowed to retain.

96.     Defendants have been unjustly enriched to the detriment of the United States government.

97.     By reason of the overpayments described above, the United States government is entitled to damages in an amount to be determined at trial exclusive of interest and costs.

## COUNT FIVE

### FRAUD IN THE INDUCEMENT

98.     Relators reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

99.     Defendants made material, false representations to the government, namely that they would provide services that are medically necessary and meet

**FALSE CLAIMS ACT COMPLAINT – Page 26 of 28**
*FILED UNDER SEAL*

professionally recognized standards of care. Defendants knew these representations

were false or made recklessly. Defendants have been unjustly enriched to the detriment

of the United States government.

100.    Defendants made the representations with the intent that the government

rely upon them. The United States government and the Commonwealth of Pennsylvania

did in fact rely on these representations in reimbursing the claims made by defendants

for payments.

101.    The representations caused injury to the government in that they induced

the government to make payments for unnecessary services, services that were not

provided or services that were so substandard as to constitute no services at all.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relators respectfully request this Court to enter judgment

against defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times

the damages sustained by the United States because of the false claims and fraud alleged

within this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729, *et seq.* provides;

(b)     That civil penalties of $10,000 be imposed for each and every false claim

that defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable

attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing

and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)     That the Relators be awarded the maximum percentage of any recovery allowed to them pursuant to the False Claims Act, 31 U.S.C. §3730(d)(1),(2) and be awarded attorneys' fees as provided by statute;

(f)     That the Relators be awarded damages and restitution on account of defendants' retaliation against them for attempting to address the conduct of defendants;

(g)     For Counts Three, Four, and Five above, the United States seeks recovery of all damages it has sustained, in amounts to be determined at trial, together with such other and further relief to which it may itself be entitled; and

(h)     That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

Respectfully submitted,

**BAGBY & ASSOCIATES LLC**

By: _____
John S. Bagby, Jr. (PA 32647)
Route 252 South, Suite 301
Paoli Executive Green II
Paoli, PA 19301
Tel: (610) 889-1550
Fax: (610) 889-1571
jbagby@bagbylaw.com

Date:  January 21, 2010

**FALSE CLAIMS ACT COMPLAINT – Page 28 of 28**
***FILED UNDER SEAL***

## RELATOR'S VERIFICATION

I, Susan Johntz, M.D., hereby verify as Relator in the instant False Claims Act matter, that all the facts and allegations contained in the foregoing False Claims Act Complaint are true and correct to the best of my personal knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Susan Johntz, M.D.
60 West Lodges Lane
Bala Cynwyd, PA  19004

### RELATOR'S VERIFICATION

I, Glenda Headley, RN, hereby verify as Relator in the instant False Claims Act matter, that all the facts and allegations contained in the foregoing False Claims Act Complaint are true and correct to the best of my personal knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Glenda Headley, RN
3221 Philmont Ave.
Huntingdon Valley, PA 19006

## CERTIFICATION OF SERVICE

I, John S. Bagby, Jr., Esquire, hereby certify that a true and correct copy of

the foregoing False Claims Act Complaint, was served on the U.S. Government on this

date by Certified U.S. Mail, as addressed as follows:

> The Honorable Eric Holder
> United States Attorney General
> U.S. Department of Justice
> 950 Pennsylvania Avenue
> Washington, D.C., 20530-0001

> Michael L. Levy, USA
> U.S. Attorney for the Eastern District of Pennsylvania
> 615 Chestnut Street, Ste. 1250
> Philadelphia, PA 19106

By:_____
John S. Bagby, Jr.

Date: January 21, 2010